UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

   - v. -                                      :

                                          **21 CR. 618 (NRB)**

TARAS ILLICH BEVZ,                 :

            Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT TARAS ILICH BEVZ**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

VLADISLAV VAINBERG
Assistant United States Attorney
- Of Counsel -

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | | Factual Background | 2 |
| | A. | BEVZ's Preparation for the Scheme to Launder Funds | 2 |
| | B. | BEVZ Launders Proceeds from Two Internet Fraud Schemes | 2 |
| | 1. | The Hacking Scheme | 3 |
| | 2. | The Vehicle Fraud Scheme | 3 |
| | C. | Impact on Victims | 5 |
| II. | | Guidelines Calculation | 7 |
| III. | | Sentencing Legal Principles | 8 |
| IV. | | Section 3553(a) Analysis | 9 |
| | A. | The Nature and Circumstances of the Offense | 10 |
| | B. | History and Characteristics of the Defendant | 11 |
| | C. | The Need to Afford Adequate Deterrence | 12 |
| V. | | BEVZ's Arguments | 12 |
| | A. | BEVZ's Role in the Scheme | 13 |
| | B. | BEVZ's Proceeds | 13 |
| | C. | BEVZ's Detention | 13 |
| VI. | | Conclusion | 14 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 21 CR. 618 (NRB) |
| TARAS ILLICH BEVZ, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT TARAS ILLICH BEVZ**

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant TARAS ILLICH BEVZ ("BEVZ" or "the defendant"), which is scheduled for December 1, 2022, at 3:00 p.m.[1]

On November 12, 2019, BEVZ, a Russian citizen, travelled to the United States on a tourist visa to engage in a fraudulent crime spree that left over 40 people and entities with over a million dollars in losses. For approximately the next year and a half—from the day he arrived, through at least April 2021—BEVZ participated in and supervised the laundering of proceeds of various sophisticated internet fraud schemes through payments to co-conspirators abroad. BEVZ and a co-conspirator opened multiple U.S. bank accounts in the name of sham entities to receive funds from fraudulent schemes that deceived purchasers of vehicles online that were never delivered, as well as funds from compromised bank accounts. On June 16, 2022, BEVZ pleaded guilty to Count 2 of the Indictment, charging him with conspiracy to commit money laundering.

As discussed below, the applicable Sentencing Guidelines range in this case is 46 to 57

---

[1] The Probation Office's final presentence report filed September 6, 2022 is referenced as the "PSR". The defendant's sentencing submission filed belatedly on November 19, 2022, is referenced as "Def. Mem."

months' imprisonment. The Probation Office has recommended a sentence of 40 months' imprisonment. The Government respectfully submits that scheme's extremely destructive impact on over 40 victims as well as the defendant's supervisory involvement in it, warrants a sentence within the Guidelines range, and that a lower sentence would fail to serve the essential sentencing goals of providing just punishment, affording general deterrence, and promoting respect for the law.

### I. Factual Background

#### A. BEVZ's Preparation for the Scheme to Launder Funds

On November 12, 2019, BEVZ entered the United States from Russia on a B2 tourist visa, which prohibited him from working in the United States. He immediately set to work preparing for the corrupt scheme to launder proceeds of various internet frauds. PSR ¶ 11. On the day of his arrival, BEVZ registered a corporation in New York named "Bevz Benz Inc." *Id.* ¶ 12. Subsequently, on May 14, 2020, the defendant registered "Pro Auto Depot, Inc." (together, with Bevz Benz Inc., the "BEVZ Companies"). *Id.*

From December 2019 to March 2021, BEVZ opened bank accounts for one or both of the BEVZ Companies at nine different banks (collectively, the "BEVZ Accounts"). PSR ¶ 13. Many of these bank accounts were opened at Manhattan bank branches. *Id.*

#### B. BEVZ Launders Proceeds from Two Internet Fraud Schemes

From November 2019 through at least April 2021, BEVZ participated in a scheme to launder the proceeds of internet fraud schemes, either withdrawing the funds as cash or making transfers to bank accounts in Turkey. The BEVZ Accounts received proceeds from at least two internet fraud schemes: a hacking scheme and a vehicle fraud scheme. PSR ¶ 14. Acting quickly to avoid bank clawbacks following the victims' discovery that they had been defrauded, BEVZ conducted numerous cash withdrawals and transfers shortly after he received victim funds. In connection with the cash withdrawals, BEVZ signed withdrawal slips or showed identification consistent with when

he opened the accounts, proving that he was the one making the transactions. BEVZ persisted in this scheme even after at least one bank prevented him from transferring money and shut down his account.

        1.        **The Hacking Scheme**

The hacking scheme involved obtaining unauthorized access to multiple companies' bank account through which perpetrators could dissipate funds to themselves. For example, on July 29 and 30, 2020, one of the BEVZ Accounts received two deposits totaling $96,000 from a granite and other stone supply company. PSR ¶ 15. The stone supply company indicated that it had been hacked through a malicious email link. *Id.* On July 30, 2020, immediately after obtaining these illicit hacking proceeds, BEVZ made three withdrawals totaling $9,400 from the account. *Id.* He also attempted to transfer $39,000 to an account in Turkey, but that transfer was blocked by the bank, which subsequently returned the remaining money to the victim. *Id.* Notably, although the bank also closed BEVZ's domestic account, BEVZ remained undeterred from continuing to participate in the schemes. On another occasion, on or about January 19, 2021, a heating company reported having its accounts hacked after an employee clicked on a malicious email attachment, with hackers sending multiple unauthorized wires from its accounts exceeding $2.3 million. *See generally* VIS-4. Among those transactions, $80,000 was sent directly into an account controlled by the defendant.

        2.        **The Vehicle Fraud Scheme**

Multiple BEVZ Accounts received proceeds from a fraud scheme in which victims responded to internet ads for the sale of cars, RVs, motorcycles, and boats. PSR ¶ 16. The purported seller of the vehicles would then direct the victims to a dealer/broker to make the transaction appear legitimate, and then the dealer/broker would instruct the victims to send the purchase money to "escrow" to the BEVZ Accounts and other bank accounts controlled by other

people.  *Id.*  BEVZ quickly withdrew or transferred the money from accounts under his control, and the purported cars, motorcycles, and boats were never delivered to the victims.  *Id.*  In total, from April 2020 through April 2021, the BEVZ Accounts received at least $786,034 in proceeds from the vehicle fraud scheme, coming from at least 33 victims.  PSR ¶ 17.

For example, on June 1, 2020, one of the BEVZ Accounts received two deposits, one for $10,500 and the other for $5,990, from two different victims of the vehicle fraud scheme, who sent the money to purchase vehicles they had seen in online advertisements.  PSR ¶ 18.[2]  On June 2, 2020, BEVZ withdrew $16,400 in cash from the account.  *Id.*

As another example, on March 23, 2021, one of the BEVZ Accounts received a $40,000 deposit from a victim who had sent the money to purchase a boat from an online advertisement.  PSR ¶ 19.  On March 24, 2021, BEVZ wired $36,150 to a bank account in Turkey and withdrew $3,800 in cash.  *Id.*

BEVZ also acted as a manager or supervisor of at least one other individual who similarly opened bank accounts and transacted with proceeds from the vehicle fraud scheme ("CC-1").  PSR ¶ 20.  BEVZ and at least one other person ("CC-2"), directed CC-1's activities by, among other things, instructing CC-1 how and where to open bank accounts in the name of a New York company registered to CC-1, providing CC-1 with information about incoming deposits from purported vehicle sales, and instructing CC-1 how to withdraw or transfer the funds received.  *Id.* From November 2020 to April 2021, accounts opened by CC-1 received at least $258,890 in proceeds from the vehicle fraud scheme from approximately nine victims.  *Id.*[3]

---

[2] The PSR reflects a typographical error in Paragraph 18 carried over from information provided by the Government referring to year "2021" instead of the correct "2020" for these transactions.

[3] BEVZ and CC-1 were not the only scheme participants who received victim funds from the vehicle and hacking fraud schemes.  However, pursuant to his plea agreement and consistent with United States Sentencing Guideline Section 1B1.3(a)(1)(B), BEVZ is being held responsible only for proceeds

4

## C. Impact on Victims

The forty-two victims who lost money as part of BEVZ and his co-conspirators' schemes include vulnerable victims whose business and personal savings accounts were drained as a result of the fraud. They include a family with an ailing parent who spent $26,500 to purchase an RV to transport their sick parent cross-country over the holidays, but never received it and lost their money, causing great grief. The victims represent a cross-section of society, including first generation Americans, teachers, small business owners, and working class people. Some have had to delay their dreams of retiring after reaching retirement age, as they continue to work to pay off loans for vehicle purchases that were a scam.

In addition to financial hardship, many victims suffered extreme stress and anxiety from being victimized by these scams, jeopardizing their relationships within their families and suffering humiliation from revealing that they had been scammed of hard earned savings. Eight of the victims in this case have submitted heartfelt, difficult-to-write letters in connection with BEVZ's sentencing, detailing the emotional and financial loss, pain, and suffering caused by BEVZ and this scheme. The Government highlights certain salient facts about some of the victims below.[4]

Several of the victims highlighted how sophisticated the underlying scams were. Many victims conducted research and background checks on the seller companies and requested documentation prior to sending money. Victim-1 described herself as a "cautious, smart wom[a]n, but this scam was so tactfully executed [that] even after researching [the seller entity] in depth we still were deceived". VIS-1. It involved shell companies, fake websites, and fraudulent

---

deposited into accounts controlled by BEVZ and CC-1, because those were the amounts laundered by the conspiracy that were reasonably foreseeable to BEVZ.

[4] The Government refers to each Victim by the numerical identifier of their Victim Impact Statement provided to the Court.

documentation. Another victim shared being told by law enforcement that the websites, communication, and sales tactics used in the boat scheme were "better and more sophisticated than actual marinas." VIS-2. The hacking schemes, required specialized malicious software to gain access to corporate victims' accounts.

Once the funds were stolen and the fraud apparent, victims found themselves spending "countless hours on the phone calling law enforcement, transferring emails, working with bank fraud departments and reporting as many minor details as possible in hopes to track down and catch who ever could have done this." VIS-1. Although in some cases, banks were able to claw back some amounts of money, in many cases the funds were quickly dissipated by BEVZ and CC-1, who rapidly withdrew the money as cash or sent it to accounts beyond reach in Turkey.

Multiple victims took out loans to help fund vehicle purchases that they never received, leaving them with dwindled accounts and new loan balances to pay off after losing their money. Victim-1 and her husband's "entire business and personal savings accounts were drained to pay back the loan amount." VIS-1. Another victim suffered a "devastating" loss of $10,500 that he is still paying off through a loan. VIS-3. Another couple is still "paying for his crime with interest as [they] refinanced [their] home to obtain this boat." VIS-2. They recognize that "Taras Bevz's criminal act will live with us for the next fifteen years as we pay down the forty thousand through our mortgage with interest. His crime will financially impact us for years and years to come." *Id.*

In addition to the financial loss, families experienced predictably difficult consequences from not obtaining the vehicle they counted on having purchased. One victim ensnared in the defendant's scheme had wired $26,500 to purchase an RV to help get her ailing father from North Carolina to Texas. VIS-8. The RV was never delivered. *Id.* This created an "incredibly stressful" situation over the holidays for her and his family that caused "much grief." *Id.*

These scams caused enormous emotional distress to the victims and their families. As one

victim described it:

> We couldn't bear to tell our family members or our friends so we have suffered and struggled financially in silence. My husband and I have never felt so embarrassed, ashamed, distraught and absolutely irate that anyone would ever do something so awful. I'm honestly not sure how but our marriage was able to survive. It was a fully consuming turmoil that could have very easily broken us. . . . Aside from the general physical symptoms of stress and anxiety, we lost sleep for months wondering if we would ever be able to move past this, how we would ever regain any sort of financial stability and be able to forgive ourselves for not knowing any better. I wouldn't wish this on anyone, it has truly been one of the worst, most stressful, infuriating and completely consuming situations we have ever been through.

Another victim related, "I cannot convey the emotional distress I felt when the bank called me and told me that the funds were withdrawn before the vehicle (which was never received) was shipped. This experience caused financial hardship ($12,500) and great hesitation to ever perform any online purchases." VIS-6. "I had pictures in my head of this thief walking into the bank and stealing my hard earned money for many months. It affected my relationship with my wife and ability to sleep at night." *Id.* Some of the victims experience a permanent loss of trust. A victim who had been a "very trusting person" found that "this [crime] destroyed my faith in people" and expressed her "hope our system can bring justice." VIS-8. *See also* VIS-6 ("The entire situation is embarrassing and has caused me to not trust anyone".).

**II.     Guidelines Calculation**

The Probation Office has calculated the United States Sentencing Guidelines (the "Guidelines") applicable to this offense consistently with what the parties stipulated in their plea agreement.

BEVZ's total offense level under the Guidelines is 23, based on the following:

- Pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(H), the base offense level is 22, because the value of the laundered funds was greater than $550,000 but less than $1,500,000.
- Pursuant to U.S.S.G. §§ 2S1.1(b)(2)(B), two offense levels are added because the conviction is under 18 U.S.C. § 1956.
- Pursuant to U.S.S.G. § 3B1.1(c), two offense levels are added because the defendant was an

7

organizer, leader, manager, or supervisor of a criminal activity.
- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a three-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a) and (b).

PSR ¶¶ 28-36.

BEVZ's criminal history category is I. PSR ¶ 40. Based on an offense level of 23 and a criminal history category of I, the applicable Guidelines range is 46 to 57 months' imprisonment. PSR ¶ 70.

### III. Sentencing Legal Principles

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), which are: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Under Section 3553(a), "in determining the particular sentence to impose," the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

### IV. Section 3553(a) Analysis

The Government respectfully submits that a sentence within the Guidelines range of 46 to 57 months' imprisonment is necessary to reflect the seriousness and aggravated nature of BEVZ's crimes, provide just punishment, afford general deterrence, and promote respect for the law.

### A. The Nature and Circumstances of the Offense

The offense is very serious and should be punished accordingly. For over a year and a half, BEVZ facilitated an international fraudulent crime spree that targeted over 40 known victims in the United States and defrauded them of over a million dollars. It is apparent that BEVZ travelled to this country with the intent of committing this offense, having registered a corporation that would be used to launder proceeds on the literal day he arrived. BEVZ plainly worked with foreign co-conspirators (whom he euphemistically called "clients" during his plea allocution) to whom he sent proceeds abroad, including accounts in Turkey. Although other individuals were responsible for running the underlying schemes, it is clear that the success of those schemes depended on BEVZ. Victims were led to believe they were purchasing cars, boats, and other vehicles in the United States and accordingly needed to be given a U.S.-based bank account to which to send the money. BEVZ and a co-conspirator he supervised were crucial to the scheme because they opened these accounts in the United States, monitored these accounts for payments from victims, and then promptly withdrew the victims' money to distribute to co-conspirators before the victims' banks could claw back the funds. BEVZ laundered these funds to hide their origin, remove them from victims' reach, and enrich himself of a percentage of the victims' proceeds.

As is evident in the victims' poignant submissions to the Court, BEVZ's crimes caused tremendous pain and hardship to many people. BEVZ knew that the funds arriving to these accounts stemmed from illegal activity and could see from statements that they came from many different individuals and entities. Those victims, as described above, have had to put their retirement on hold and struggle to pay off loans taken to finance the fraudulent purchases. One of the themes running through the victims' letters to this Court is how much this crime also hurt them emotionally – how they replay in their minds the fraudster walking into a bank and withdrawing their hard earned money. They struggle to comprehend how hard they worked to save money and

how the scheme participants had stolen the fruits of their labor. The letters make clear that the financial hardships they are suffering are equally matched by a loss of joy and the capacity to trust, and in some cases extreme anxiety. The extraordinary damage BEVZ has helped cause to these innocent victims warrants a stiff punishment within the Guidelines range.

### B.     History and Characteristics of the Defendant

BEVZ is a well-educated 33-year-old man, the son of a doctor and an art dealer, who reported a "happy" childhood and continued support from his family. PSR ¶¶ 45-47. BEVZ was born in Russia, where he obtained a bachelor's degree in law and owned a company brokering construction machinery rentals from 2014 through 2019. PSR ¶ 63. BEVZ reported earning approximately $10,000 a month from that business. *Id.* Put simply, compared to many defendants sentenced by this Court, BEVZ was fortunate to report a privileged upbringing, no substance abuse problems, and a successful legitimate employment. There was simply no reason other than greed for BEVZ to engage in the offense conduct.

In his submission to this Court, BEVZ claims he was "lured into the criminal conspiracy through a false advertisement for a job." Def. Mem. 7-8. But the defendant did not somehow fall into this offense. Regardless of how he learned about this criminal opportunity, there is no question that he found it to be more lucrative than applying his legal degree or the $10,000 monthly he was apparently earning from his business in Russia. He agreed to join the conspiracy, and formulated and carried out all the steps necessary to make it a success. BEVZ first lied to U.S. immigration officials in order to enter the United States as a "tourist", where he raced to begin incorporating entities and opening bank accounts that would be used for this scheme. BEVZ then opened nine bank accounts and handled dozens of transactions, day in and day out, to move victims' money out of the United States to his co-conspirators. BEVZ's entire existence in the United States was devoted to this money laundering offense. And BEVZ expanded the scope of the conspiracy by

11

supervising another member in the United States to launder additional proceeds through more accounts.

### C. The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*

The need for deterrence is heightened here, where victims in the United States were targeted by foreign actors who sent a co-conspirator abroad to facilitate the frauds here. These internet-based frauds are widespread, difficult to investigate, and extremely lucrative to scheme participants. Individuals, like BEVZ, who choose to come to the United States in order to commit these kinds of crimes should know that they will face a significant sentence if they are apprehended.

### V. BEVZ's Arguments

BEVZ argues that he should receive time served (approximately 14 months of custody) based on (1) his comparatively lesser role in the scheme than other scheme participants; (2) the smaller amount of fraud proceeds that he personally retained compared to some other participants; and (3) the general difficulty of his pretrial detention. *See* Def. Mem. at 7-9. Many of BEVZ's arguments are already incorporated into the Guidelines or do not otherwise merit a variance, and should be rejected.

### A. BEVZ's Role in the Scheme

BEVZ's role in the scheme is adequately captured by the fact that his Guidelines range is based solely on funds that were received in his accounts or the co-conspirator he supervised. He is not being held responsible for the additional two-plus millions of dollars of funds known by the Government to have been sent to other co-conspirators. *See, e.g.*, VIS-4. And although his role in the scheme was different from individuals who directly communicated with victims or conducted the hacking, his willingness to come to the United States to set up the financial infrastructure and control the payment flow was crucial to the scheme's success. Thus, the notion that BEVZ deserves a downward variance from the (already lower) Guidelines is simply untethered to the facts. Such a sentence would amount to a slap on the wrist for a serious crime that devastated dozens of victims.

### B. BEVZ's Proceeds

BEVZ argues that he received less money from this scheme than certain other scheme participants, claiming that he retained 7-10% of victim funds, a statement that is difficult for the Government to assess in light of the use of cash withdrawals. In any case, there is no question that BEVZ's conduct helped directly cause over a million dollars in losses to victims who transferred that amount to accounts he controlled or supervised, which is the amount for which he is being held responsible. The fraud paid well enough that BEVZ could sustain himself in the United States for more than a year and a half before his arrest, living in New York City and Los Angeles. And it was apparently more lucrative than remaining at his $10,000/monthly business in Russia. Finally, BEVZ was crucial to the conspiracy. He is not entitled to a sentencing discount simply because other scheme participants kept more of the money he laundered.

### C. BEVZ's Detention

BEVZ was detained upon arrest due to his obvious risk of flight and lack of ties to the United States. He devotes a significant portion of his letter to the Court complaining about his pre-trial

detention period at the Metropolitan Detention Center. He expresses that it is "totally wrong and corrupt" for the American justice system to house first time nonviolent offenders such as himself in the same population as convicted murders and gang members during pretrial proceedings. BEVZ Ltr at 1. He complains about having "often" been served bologna sandwiches for lunch and dinner, and showering every other day or every third day. *Id.* Although BEVZ devotes significantly more space in his personal letter on these complaints than on discussing his offense and its impact on victims, BEVZ does not articulate any particular condition or treatment that made his prior detention (or would make any future incarceration) more difficult than any other defendant's. Indeed, BEVZ is a physically and mentally healthy 33-year old man who is not entitled to any leniency on account of being detained during pretrial proceedings in a country he entered to commit this offense.[5]

## VI. Conclusion

Given the facts here, a sentence within the Guidelines range of 46 to 57 months is appropriate and just. Such a sentence would adequately reflect the seriousness of BEVZ's crime, provide just punishment, and send a message to would-be money launderers for similar schemes that a substantial jail term is the likely consequence of such criminal conduct. A sentence substantially below the Guidelines range would be perceived by the public and the victims as a slap on the wrist and would fail to serve the essential sentencing goals of providing just punishment, affording deterrence and promoting respect for the law. BEVZ also should be ordered to pay forfeiture of $1,044,924 and restitution of the same amount.

Dated: New York, New York
       November 23, 2022

---

[5] BEVZ also asks for leniency because "the situation in Russia is not easy again. The war is going on, as you probably know, full scale and I only hope that I can be near my family as soon as possible to be able to support them and go through it together". BEVZ Ltr. at 1. While it is unclear what support BEVZ means to provide, the notion that BEVZ should be afforded a sentencing break because his home country invaded Ukraine is frivolous.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Vladislav Vainberg
Assistant United States Attorney
(212) 637-1029

cc: Defense counsel (via ECF)